AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States District Court
Southern District of Texas
FILED

NOV 14 2019

David J. Bradley, Clerk

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
8505 Senecio Street, Mission, Texas. )
SEARCH TO INCLUDE HOME, OUTBUILDINGS, )
VEHICLES, APPURTENANCE, AND CURTILAGE. )

Case No. M-19-2793-M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ____Southern____ District of ____Texas____ *(identify the person or describe property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __8__ U.S.C. § __1324__, and the application is based on these facts:

See Attachment C

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FATIMA ALKHATIB, HSI SPECIAL AGENT
*Printed name and title*

Approved by AUSA Frances E. Bahr on 11/14/2019.

Sworn to before me and signed in my presence.

Date: November 14, 2019

*Judge's signature*

City and state: McAllen, Texas

Peter E. Ormsby, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF THE PROPERTY TO BE SEARCHED

The property to be searched is located at 8505 Senecio Street, Mission, Texas 78574, and includes all outbuildings, vehicles, appurtenance, and curtilage. Below is a photograph of the property to be searched.



## ATTACHMENT B

## ITEMS TO BE SEIZED

1. The items to be searched and seized that constitute evidence of or relates to violations of Title 8 United States Code, Section 1324, include, but are not limited to, the following:

   a. Books, records, receipts, note ledgers, identity documents, and other papers or documents relating to the harboring and transportation of illegal aliens;

   b. United States Currency and financial instruments indicative of the proceeds of illegal alien smuggling;

   c. Vehicles used to facilitate the smuggling of illegal aliens, and/or purchased with illegal alien smuggling proceeds;

   d. Video and still photography; in particular, photographs of co-conspirators, maps or locations utilized for alien transporting and harboring, assets, or smuggled aliens;

   e. Indicia of occupancy, residency and/or ownership of the premises described in Attachment A or hotels where aliens may have been harbored, including, but not limited to, utility and telephone bills, canceled bills, keys, and hotel receipts;

   f. Indicia of ownership or use of vehicles utilized for alien transportation, including, but not limited to, vehicle titles, contracts, car insurance, and keys;

   g. Receipt for items evidencing expenditures in amounts indicative of the proceeds of alien smuggling including, but not limited to, electronic equipment, weapons, luxury purses or clothing, make-up, and vehicles;

   h. Cellular phones, all records on the device, all applications on the device, SIM card, and other memory cards, used as a method of communicating during alien smuggling events

that often contain co-conspirator's telephone numbers in memory and are often used by alien smugglers as a tool of the trade. All text messages, voice messages, records of incoming and outgoing telephone calls, saved map locations, photographs, and videos regarding alien smuggling;

    i. Computers, computer hardware, software, peripheral devices, documentation, data security devices, and electronic storage devices which may contain items described above to the extent such equipment and devices are not otherwise subject to seizure, agents shall promptly arrange for any stored electronic information to be copied and preserved as evidence so that the equipment and devices may be returned within a reasonable time.

2. In order to search for data capable of being read or interpreted by a computer for the items listed above and subject to the procedures set forth below, law enforcement personnel will need to search and seize electronic equipment located at the property described in Attachment A stored in any:

    a. Electronic devices capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include but are not limited to any data processing hardware (such as central processing units, memory typewriters, and self-contained "laptop," "notebook," or "tablet computers"); internal and peripheral storage devices (such as laser disks, fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems,

    cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks);

b. Information, instructions, programs or program code, stored in the form of electronic, magnetic, optical, or other media capable of being interpreted by a computer of its related components, data, data fragments, or control characters integral to the operation of computer software, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components;

c. Any written, recorded, printed, or electronically stored material which explains or illustrates the configuration or use of any seized hardware, software, or related item;

d. Devices, programs, or data whether themselves in the nature of hardware or software that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records documents, or materials within the scope of this application, any data security hardware (such as any encryption devices, chips, and circuit boards), passwords, data security software of information (such as test keys and encryption codes), and similar information

that is required to access computer or data or to otherwise render programs or data into a useable form;

e. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

f. Any computer equipment used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

g. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, USB flash drive, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

h. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

i. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

j. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data;

k. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data;

l. "Mainframe" computers, or "micro" or "personal" computers, either standing alone or joined through a series of connected computers called a "network;"

m.  All magnetic storage devices as well as the central processing units ("CPUs") and applicable keyboards and monitors which are an integral part of the processing unit; and

n.  Various file "directories" and the individual files they contain, recently deleted data; scanning storage areas for deliberately hidden files.

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Fatima B. Alkhatib, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the property located at 8505 Senecio Street Mission, Texas 78574, including the home, outbuildings, vehicles, appurtenance, and curtilage (the "Target Location"), as more particularly described in Attachment A. Based on the facts set forth in this affidavit, your affiant believes that evidence and instrumentalities, more particularly described in Attachment B, of violations of Title 8 United States Code, Section 1324 exists at the Target Location.

2. I am a Special Agent with the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), a federal law enforcement agency, and have been since September 2015. I have received approximately twenty-four (24) weeks of specialized training at the Federal Law Enforcement Training Center ("FLETC"). This training included several hundred hours of comprehensive, formalized, and specialized instruction on numerous subjects, including, but not limited to: alien smuggling, narcotics smuggling, money laundering, counter-proliferation, physical surveillance, electronic surveillance, and undercover operations. I have also consulted with other federal agents who have extensive and specialized experience in conducting alien smuggling, money laundering, narcotics smuggling, Title III Electronic Surveillance, and other investigations of federal law violations. In addition, I have been associated with investigations involving the interception of wire and electronic communications. I am familiar with the ways in which alien smugglers, narcotic traffickers,

8

and money launderers conduct their business, including, but not limited to, their methods of importing, distributing, and smuggling controlled substances and undocumented aliens and their use of cellular telephones and code words to conduct their transactions.

3. Prior to joining HSI, I served as a U.S. Customs and Border Protection Officer ("CBPO") for approximately ten years. In connection with my official duties as a CBPO, I gained experience identifying narcotics, alien smuggling routes, and alien smuggling techniques. I also gained experience interviewing individuals apprehended during the course of interdictions. During this time, I gained experience in the evolution of techniques and methods utilized by narcotics and alien smugglers to successfully avoid detection and apprehension by law enforcement officers. I also participated in intelligence gathering operations focused on identifying narcotics smuggling activity.

4. During my career, I have been part of numerous arrests linked to harboring and to transporting of undocumented aliens. Through these arrests, along with my training and experience as well as conversations with other agents and law-enforcement personnel, I have become familiar with the methods used by human smugglers to smuggle and to safeguard undocumented aliens and to thwart or evade investigations of their trafficking organizations. One of the tactics frequently used by these organizations is the consistent use of cellular telephones to coordinate the smuggling arrangements of undocumented aliens into the United States. I am aware that members of these organizations often store co-conspirators' telephone numbers in the telephone memory and communicate using code names through cellular telephones and their radio transmitters to facilitate transactions and to conceal their identities.

5. I have debriefed and interviewed numerous individuals who have been involved in and have personal knowledge of transporting and concealing undocumented aliens, as well as,

the amassing, spending, converting, transporting, distributing, laundering, and concealing of proceeds from alien smuggling. I have participated in numerous investigations involving physical surveillance, electronic surveillance, and execution of federal search warrants.

6. Based on my training and experience and in working with other agents, through debriefs of alien smugglers, confidential informants, and cooperating defendants, I know that alien smugglers record, document, and keep track of their human cargo utilizing technology such as cellular telephones and their applications. Through my training and experience, I know alien smugglers do this in order to save and share the information with alien smugglers to provide evidence that their human cargo was successfully received, moved or turned over to other alien smugglers. Additionally, based on my training and experience, I know that if human cargo is lost, alien smugglers will use cellular telephones to document this and provide it to other alien smugglers. I also know based on my training and experience that alien smugglers document these activities by using cellular telephones equipped with still and video photography, as well as messaging applications.

7. Based on my training and experience, I know that alien smugglers consistently utilize multiple cellular telephones and applications on the cellular telephones as a method of communicating and sharing information with co-conspirators, storing photographs or videos of their human cargo, facilitating the smuggling of their human cargo, as well as avoiding detection by law enforcement. Alien smugglers are known to store information in their cellular telephone's memory, including but not limited to the names, address, and telephone numbers of co-conspirators, as well as text and voice messages received from, or sent to, their co-conspirators.

8. Other evidence, such as cellular phones, cameras, video recorders, electronic memory cards, computers, iPads, electronic notebooks, computers, and photographs are maintained by human smugglers as a way of documenting their alien smuggling activities by photographing their human cargo, the firearms used in the commission of their crimes, monies received or bank accounts used, or the locations and vehicles utilized during their alien smuggling operations, as well as for communicating with co-conspirators and other purposes. Alien smugglers will store these electronic items and records in their homes, outbuildings, and vehicles in order to avoid detection by family, guests, and law enforcement.

9. Through my training and experience, I have also learned that such evidence of alien smuggling also includes: books, records, receipts, notes, ledgers, scanned documents, currency, financial instruments, financial records, and other papers. That is, evidence in alien smuggling investigations includes papers, tickets, notes, schedules, receipts, ledgers, documents, and other items related to domestic and international travel; addresses or telephone numbers in books, papers, or electronic format; documents, forms and papers indicating the locations used for, or the whereabouts of individuals or groups of individuals involved in, alien smuggling; identification, identifying information and contact information of individuals or group of individuals related to alien smuggling; and indicia of occupancy, residency, use, and/or ownership of the premises or locations where aliens may have been smuggled, including their businesses, residences, and vehicles, which includes but are not limited to, utilities and telephone bills, cancelled bills, envelopes, keys, receipts, contracts, car insurance, and documents reflecting the manner and means of the purchase or use of the property. Alien smugglers will store these items in their homes, vehicles, and outbuildings to avoid detection from family, guests, and law enforcement.

10. In my training and experience, I have learned that alien smugglers store proceeds and financial instruments, including but not limited to currency, money orders, or other assets, related to alien smuggling in their homes, vehicles, and outbuildings. In my training and experience, I also know that alien smugglers store other items of evidence related to alien smuggling in their homes, vehicles, and outbuildings, such as books, records, receipts, notes, ledgers, documents, financial records, financial instruments, currency, money orders, assets, and other papers related to alien smuggling; records concerning bank accounts, brokerage accounts, and records of off-site locations to store records, including: safe deposit boxes and keys, records and receipts, rental agreements for storage facilities or other properties, and records of mail and answering services including telephones and pagers.

11. Through my training and experience, I have learned that alien smugglers commonly seek to launder the proceeds of their alien smuggling ventures by purchasing other products or assets for resale in an attempt to avoid law enforcement detection. Based on my training and experience, I know that individuals involved in alien smuggling maintain and store such products and assets in their homes, vehicles, or in outbuildings on their property, to ensure their items are inaccessible to family, guests, and/or law enforcement. Accordingly, through information developed in this investigation, I believe that the residence located at 1108 E. Seventh Street in San Juan, Texas contains evidence in connection with the harboring and transporting of illegal aliens, in violation of Title 8, United States Code, Section 1324.

12. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not

set forth all of my knowledge about this matter. References to law enforcement personnel in this case will generally be referred to as "agents," unless specified by name and agency.

13. This affidavit is intended to show that sufficient probable cause exists for the requested warrant and does not set forth all of my knowledge about this matter. This affidavit was approved for filing by AUSA Frances E. Blake.

## PROBABLE CAUSE

14. On November 12, 2019, Border Patrol Agents ("BPA") at the Falfurrias, Texas Border Patrol Station apprehended 14 undocumented aliens ("UDAs). The UDAs were taken to the Falfurrias BP Station for interviews and processing.

15. One of the UDAs, Ever Paredes-Florian, gave BPAs the following non-verbatim statement: After crossing the river illegally from Mexico, Paredes-Florian was picked up by an unidentified male and taken to a stash house later identified as the Target Location.

16. Paredes-Florian and the driver stayed at the Target Location for approximately 3-4 hours.

17. While at the Target Location, Paredes-Florian sent his GPS location via WhatsApp, to his girlfriend in the United States and to a smuggler in Mexico.

18. Paredes-Florian was then taken to a plaza where he was transferred to another male who took him to a second stash house that was unidentified.

19. Paredes-Florian stayed at the second stash house for approximately 4-5 days and discovered approximately 20 other UDAs already at the house.

20. On November 13, 2019, at approximately 9:00 a.m., BPAs were conducting surveillance at the Target Location.

21. BPAs observed a dark blue Ford Focus parked toward the back of the Target Location. At approximately 9:05 a.m., a light blue Chrysler Pacifica displaying Texas license plates GYM-5148 arrived at the Target Location and parked next to the blue Ford Focus.

22. BPAs observed 3 subjects exiting the light blue Chrysler Pacifica and entering the back of the Target Location.

23. At approximately 9:10 a.m., both vehicles were observed leaving the Target Location in tandem and traveling southbound on Senecio Street with the Chrysler Pacifica leading the Ford Focus.

24. BPAs observed 4 subjects inside the Chrysler Pacifica (driver, passenger and 2 subjects in the back seat).

25. The Ford Focus was being occupied by an unknown male subject.

26. Once on the expressway, the Ford Focus broke off from the Chrysler Pacifica and surveillance on the Chrysler Pacifica continued due to the presence of multiple occupants.

27. The Chrysler Pacifica continued traveling eastbound on the Expressway until it arrived at the parking lot of the Academy Sports and Outdoors store located at 3901 W Expressway 83, McAllen, Texas 78503.

28. The Chrysler Pacifica parked on the west side of the parking lot and after a brief period, a silver Jeep Commander parked next to it and both drivers conversed momentarily. No subjects exited either vehicle.

29. The Chrysler Pacifica exited the Academy Sports and Outdoors parking lot and was followed to the south side of an apartment complex located at the intersection of 8th Street and Toronto Avenue in McAllen, Texas where it parked.

30. BPAs observed 2 subjects exit the Chrysler Pacifica and enter a white Nissan Altima displaying Texas license plates LVB-1386. Prior to the Chrysler Pacifica's arrival, the Nissan Altima was already parked at the apartment complex with someone in the driver's seat.

31. The 2 subjects entered the Nissan Altima and departed the apartment complex parking lot. This affiant knows that this activity is consistent with a "body transfer," an alien smuggling tactic commonly used by human smugglers when transporting illegal aliens to/from stash houses and further into the United States.

32. Both vehicles departed the apartment complex and surveillance on the Nissan Altima now transporting the suspected UDAs was conducted.

33. Surveillance on the Nissan Altima was conducted until it entered the driveway at 4004 Jam Square Street Edinburg, Texas. BPAs observed a male subject exit the vehicle and walk toward the back of the residence. Several minutes later, the Nissan Altima exited the residence.

34. Hidalgo County Constable's Office conducted a traffic stop of the Nissan Altima for speeding.

35. BPAs approached the driver of the vehicle, Israel TOVAR-Chaidez, who admitted to being illegally present in the United States.

36. BPA Salinas read TOVAR-Chaidez his Miranda warning rights and BPA Alvarado witnessed the reading of the rights. TOVAR-Chaidez stated he understood his rights and stated he would provide a statement without the presence of an attorney. TOVAR-Chaidez provided the following non verbatim statement: TOVAR-Chaidez and his wife are current tenants of 4004 Jam Square Street Edinburg, Texas. TOVAR-Chaidez stated that here were more than 10

UDAs inside the residence. TOVAR-Chaidez gave verbal and written consent to search the residence.

37. During the vehicle stop, a female subject, later identified as Erika Susana Morales-Lopez, was encountered riding in the front passenger seat of the Nissan Altima. Morales-Lopez, admitted to being illegally present in the United States. She stated that TOVAR-Chaidez had picked her up from 4004 Jam Square Street Edinburg, Texas in order to go to his house to help with cleaning and laundry. Morales-Lopez stated that there were at least an additional 8 UDAs still at 4004 Jam Square Edinburg, Texas.

38. At approximately 11:10 A.M., BPAs along with Hidalgo County Constable's Office Precinct #4 conducted a consensual search at 4004 Jam Square Street Edinburg, Texas. BPAs encountered 15 UDAs inside the residence.

39. At approximately 10:30 a.m., during surveillance and the consensual search of 4004 Jam Square Street Edinburg, Texas, HSI SA Fatima Alkhatib and HSI TFO Miguel Cantu conducted an interview of Ever Paredes-Florian. Paredes-Florian gave the following non-verbatim statement: On November 6, 2019, Paredes-Florian was picked up by an unidentified male who took him to the Target Location. Paredes-Florian was instructed by the driver to lay down in the vehicle but was able to observe a trampoline outside of the Target Location.

40. Paredes-Florian and the driver were at the Target Location for several hours. Paredes-Florian took a photo of the inside of Target Location which was still located in his cell phone.

41. Paredes-Florian sent his girlfriend and a smuggler in Mexico the GPS location of the Target Location via WhatsApp. GPS coordinates were still located in his cell phone.

42. Paredes-Florian identified the Target Location as the first stash house he was taken to via a photo sent by BPAs conducting surveillance on the Target Location.

## CONCLUSION

43. Based on the foregoing, I respectfully request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,

FATIMA ALKHATIB
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Subscribed and sworn to before me on November 14, 2019.

PETER E. ORMSBY
UNITED STATES MAGISTRATE JUDGE